UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/27/2022
```

---------------------------------------------------------------------X
                       :

MASDA E. RODRIGUEZ,          :

                 Plaintiff,    :

                       :          20-cv-5268 (LJL)

     -v-               :

                       :      <u>OPINION AND ORDER</u>

COMMISSIONER OF SOCIAL SECURITY,  :

                 Defendant.  :

                       :

---------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Plaintiff Masda E. Rodriguez ("Plaintiff" or "Rodriguez") moves, pursuant to Federal

Rule of Civil Procedure 12(c), for judgment on the pleadings. Dkt. No. 13. The Administrative

Law Judge ("ALJ") found that Plaintiff was not disabled under the Social Security

Administration's listings and therefore denied Plaintiff's application for a period of disability and

disability benefits. Dkt. No. 12-1 at 560. Plaintiff submits that the ALJ committed errors of law

in determining that Plaintiff had the residual functional capacity ("RFC") to perform sedentary

work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) between June 13, 2013 and

September 23, 2018. Dkt. No. 14 at 4. Plaintiff asks that the Court enter an order reversing the

decision and/or remanding the matter to the ALJ. *Id.*

      Defendant Commissioner of Social Security ("Defendant" or "Commissioner") cross-

moves for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). Dkt.

No. 15. Defendant argues that the ALJ's decision was based on substantial evidence and was

free of legal error. Dkt. No. 16 at 7. Defendant asks that the Court deny Plaintiff's motion for

judgment on the pleadings, grant Defendant's cross-motion, and affirm the Commissioner's

decision. *Id.* at 40.

For the following reasons, Plaintiff's motion for judgment on the pleadings is granted, Defendant's cross-motion is denied, and the matter is remanded to the Commissioner.

## BACKGROUND

Rodriguez was born in 1968 and was forty-four years old at the alleged onset date ("AOD") of her disability on June 5, 2013.[1]  Dkt. No. 12 at 178.  She is a resident of Bronx, New York, and she has a high school education.  Dkt. No. 12-1 at 584–85.

Prior to Plaintiff's AOD, she worked as a security guard for a private company and for the New York City Administration for Children's Services ("ACS").  *Id.* at 585–87.  She also worked part-time as a home health aide from April 2012 to 2013.  Dkt. 12 at 302; Dkt. 12-1 at 585–87.  At some point prior to the AOD,[2] Plaintiff fell in the course of patrolling as part of her duties and suffered a meniscus tear on her right knee and an injury to her left ankle.  Dkt. No. 12-1 at 587–88.  She underwent surgery to repair the tear on her knee but did not experience significant improvement and continued to use a cane afterwards as prescribed.  *Id*. at 588.

In early 2015, Plaintiff also began taking insulin to manage her diabetes.  *Id*. at 589.

Also, at some point prior to the AOD, Plaintiff's mother passed away, and Plaintiff began to suffer from depression.  *Id.* at 587.

---

[1] Plaintiff's original application was for benefits beginning June 5, 2013.  The ALJ found that the issue of disability from June 5, 2013 through June 13, 2013 had been addressed by the Disability Determination Process reviewers, and the doctrine of res judicata applied.  Dkt. No. 12-1 at 559.  The period in question is therefore June 13, 2013 through September 23, 2018.  Plaintiff was forty-four years old on both June 5 and June 13, 2013.

[2] The record gives conflicting timelines for what exact year Plaintiff suffered her fall and underwent surgery.  At her hearing, Plaintiff seemed to say both the fall and her surgery were in 2013.  Dkt. No. 12-1 at 587.  Elsewhere in the record, however, the date of the accident is given as 2011 (Dkt. No. 12 at 295) and 2008 (Dkt. No. 12-2 at 920, 971).  For the purposes of this motion, the exact date of the fall does not matter given the alleged onset of the disability is June 5, 2013 and the fall happened before this date.

The ALJ[3] found that Plaintiff "has not engaged in substantial gainful activity since the alleged onset date" of June 14, 2013. *Id.* at 562.

## I.      Medical Background During Period of Alleged Disability

Plaintiff has a history of knee pain, ankle pain, diabetes, bursitis of the hip, asthma, depression, and obesity. *Id.* at 564–68. Due to her diabetes, Plaintiff also experiences vertigo, dizziness, and blurred vision. Dkt. No. 12 at 296, 365; Dkt. No. 12-1 at 590–592. Plaintiff's medical records document a number of examinations and interventions she has undergone since her fall at work to manage her physical and psychiatric impairments.

### A.      Knee Pain

Plaintiff underwent arthroscopic surgery on her right knee in 2011 following a fall at her workplace. Dkt. No. 12-1 at 565. In 2014, she visited Dr. Marilee Mescon (*see infra* Section II.A) for a consultative examination and was assessed with right knee pain. Dkt. No. 12-1 at 565. In 2014, Plaintiff's right knee was x-rayed, and a doctor found "no significant bony abnormality." *Id.* In 2017, Plaintiff was diagnosed with chronic right knee pain due to her meniscal tear. Dkt. No. 12-2 at 883–96.

### B.      Diabetes Mellitus

Plaintiff's medical records document numerous doctor's visits relating in whole or in part to her uncontrolled type II diabetes mellitus. In her 2014 examination, Dr. Mescon assessed Plaintiff with diabetes. Dkt. No. 12 at 295. During her 2014 examination with Dr. Mescon, Plaintiff alleged diabetes dating back to 2010. *Id.* Plaintiff's medical records show that her blood sugar levels range from the 300s to the 400s each morning. Dkt. No. 12-1 at 566. In

---

[3] In her first ALJ hearing on July 6, 2016, Plaintiff appeared before ALJ Sheila Walters. When Plaintiff appeared at her second ALJ hearing on April 2, 2019, ALJ Walters had retired, and Plaintiff appeared before ALJ Marguerite Toland. To avoid unnecessary individual emphasis on either ALJ, the Court will herein refer to both ALJ Walters and ALJ Toland as "the ALJ."

2015, another doctor noted that Plaintiff suffers from diabetic neuropathy caused by poorly controlled diabetes mellitus type II.  *Id.*

### C.    Bursitis of the Hip

In 2015, Plaintiff visited her then-treating physician, Dr. Jean Balzora (*see infra* Section II.D), who opined that Plaintiff suffered from chronic pain and reduced range of motion.  Dkt. No. 12 at 365.  In 2017, Plaintiff visited her then-treating physician, Dr. Kimberly Ann Lynch (*see infra* Section II.E) and was assessed with chronic right hip pain stemming from her surgical meniscal repair.  Dkt. No. 12-2 at 887.  In 2018, Plaintiff was assessed with greater trochanteric bursitis of the right hip, which required physical therapy.  *Id.*

### D.    Asthma

In 2014, Plaintiff was assessed by another doctor as having mild and intermittent asthma. Dkt. No. 12-1 at 556.  Plaintiff's medical records reflect that Plaintiff uses an albuterol inhaler and that her asthma has never been severe enough to require hospitalization.  *Id.* at 566–67.

### E.    Depression

In 2013, Plaintiff presented to a psychiatrist and was assessed with major depressive disorder, single episode of a moderate degree.  *Id.* at 567.  In 2014, Dr. Arlene Broska (*see infra* Section II.B) assessed Plaintiff with an unspecified depressive disorder, opining that Plaintiff has no limitation in her ability to follow and understand simple directions or perform simple or complex tasks independently and that Plaintiff has no limitation in maintaining attention and concentration, though there is evidence that she has mild memory limitations.  Dkt. No. 12-1 at 567.  In 2017, Plaintiff was diagnosed with major depressive disorder.  Dkt. No. 12-2 at 841–43.

### F.    Obesity

Plaintiff's medical records reflect that she had a body mass index (BMI) of 39.48 as of October 16, 2017, and of approximately 35.2 as of her second administrative hearing in 2019.

*Id.* Plaintiff was repeatedly diagnosed with morbid obesity from 2014 through 2018. Dkt. No. 12 at 330–32, 360; Dkt. No. 12-1 at 495, 860.

### G. Mobility and Use of a Cane

Although not considered as its own category of medical history by the ALJ, the Court notes that Plaintiff was consistently found to require the use of a cane for ambulatory assistance and walking on uneven terrain but not for standing. Dkt. No. 12-1 at 449–53, 517–21; Dkt. No. 12-2 at 917–46.

## II. Medical Opinions at Issue

Over the relevant time period, Plaintiff was treated by various physicians, who provided opinions on her condition.

### A. Dr. Mescon's September 29, 2014 Disability Evaluation

Dr. Mescon conducted an internal medicine examination of Plaintiff after Plaintiff was referred to her by the Division of Disability Determination. Dkt. No. 12 at 295. An MRI of Plaintiff's right knee showed a torn meniscus, and Plaintiff complained of pain in her knees that began in 2011. *Id.* Plaintiff told Dr. Mescon "that if she sits in one place for a long time her knees with [sic] lock." *Id.* Dr. Mescon opined that Plaintiff could perform routine household chores and maintain her personal hygiene. *Id.* at 296. Dr. Mescon also opined that Plaintiff's gait was "normal" and that she could walk on her heels and toes without difficulty, could squat halfway down, and had a normal stance. *Id.* at 297. Dr. Mescon further opined, however, that Plaintiff "use[d] a cane for reassurance and to stop her from falling even though she can [sic] without the cane," that she "use[d] the cane when she goes outside," that the cane "was prescribed by a doctor," and that the cane was "medically necessary because of balance issues." *Id.* Dr. Mescon reported that she found "no significant bony abnormality" on an x-ray of Plaintiff's right knee. *Id.* at 298.

Dr. Mescon reported that Plaintiff has had diabetes since 2010, that her blood sugar levels "range between 236 and 507," and that Plaintiff was hospitalized in 2012 for diabetic ketoacidosis. *Id.* at 295–96. As to Plaintiff's asthma, Dr. Mescon reported that Plaintiff has had asthma since 2005, has never been hospitalized for asthma, and sometimes used a home nebulizer. *Id.* at 296. Plaintiff was diagnosed with right knee pain, urinary tract infections, diabetes, asthma, atypical vertigo, and obesity. *Id.* at 298–99.

Dr. Mescon opined that there were no limitations in Plaintiff's ability to sit but that Plaintiff's "ability to stand for long periods of time, climb, push, pull, or carry heavy objects would be moderately to severely limited because of all of the claimant's medical problems." *Id.* at 299.

**B.      Dr. Broska's September 29, 2014 Psychiatric Evaluation**

On the same date as her examination by Dr. Mescon, Plaintiff underwent a psychiatric evaluation with Dr. Broska. Dkt. 12 at 302. Dr. Broska found that Plaintiff had not been hospitalized for any psychiatric conditions and was not in any outpatient mental health treatment. *Id.* Plaintiff reported "feeling down every day . . . because her son does not live with her," because "[s]he does not get to see her grandchildren often," and because her mother had passed away. *Id.* Plaintiff also reported feeling anxious and restless. *Id.*

Dr. Broska found that Plaintiff was "cooperative" and responsive to questioning, and that her "manner of relating, social skills, and overall presentation were adequate." *Id.* at 303. Dr. Broska opined that Plaintiff's appearance, speech, and thought processes were adequate and appropriate. *Id.* Dr. Broska found that Plaintiff's attention and concentration were intact but that her recent and remote memory skills were "mildly impaired," as she could only recall two out of three objects after five minutes. *Id.* Dr. Broska further found that Plaintiff was "able to dress,

bathe, and groom herself every day" and that she cooked twice a week, cleaned once a day, could

go shopping with her son, and could travel independently on public transportation. *Id.* at 304.

Dr. Broska opined that "[v]ocationally, there is no evidence of psychiatric limitation in

[Rodriguez's] ability to follow and understand simple directions and instructions or perform

simple or complex tasks independently, maintain attention and concentration.  There is evidence

for mild limitation in memory.  There is no evidence of limitation in her ability to maintain a

regular schedule." *Id.* at 304.  Although Dr. Broska found some evidence that Plaintiff would

have difficulty "relating adequately with others" and "appropriately dealing with stress," she did

not find evidence of a psychiatric condition "significant enough to interfere with [Rodriguez's]

ability to function on a daily basis." *Id.*  Dr. Broska diagnosed Plaintiff with "[u]nspecified

depressive disorder" and recommended psychiatric intervention and individual psychotherapy.

*Id.*

### C.      Dr. Inman-Dundon's October 24, 2014 Opinion

In response to a request for medical advice from the New York State Office of

Temporary and Disability Assistance, Dr. Tammy Inman-Dundon opined that Plaintiff's

depression did not constitute a severe impairment. *Id.* at 307.  He based this finding on a lack of

past psychiatric treatment and history and found in a one-sentence report that Plaintiff had "had

bereavement issues in-past." *Id.*  Dr. Inman-Dundon did not perform an examination of Plaintiff.

### D.      Dr. Balzora's January 15, 2015 Opinion

On January 15, 2015, Plaintiff's treating physician Dr. Balzora submitted a Medical

Source Statement.[4]  Dr. Balzora reported that Plaintiff experienced constant dizziness ("she

---

[4] The ALJ refers to Dr. Balzora as "Dr. Balrora," which appears to result from a misreading of
Dr. Balzora's handwriting.  *See* Dkt. No. 12 at 371.  Plaintiff refers to him as Dr. Jean Balzora,
and the spelling is corroborated by her medical records.  *See* Dkt. No. 12 at 358; Dkt. No. 14 at
23.

always [experiences] dizziness") and pain in her right leg.  *Id.* at 365.  He reported that Plaintiff could not stand for more than an hour and had a reduced range of motion.  *Id.*  He reported that Plaintiff had experienced weight change, muscle spasms, and muscle atrophy, and had a positive straight leg raising test.  *Id.*

Dr. Balzora opined that emotional factors, namely depression, contributed to the severity of Plaintiff's symptoms and functional limitations.  *Id.* at 366.  He opined that she frequently experienced pain severe enough to interfere with her attention and concentration but that Plaintiff was not limited in her ability to deal with work stress.  *Id.*  Dr. Balzora opined that Plaintiff could sit continuously without standing or walking about for a maximum of one hour at a time and that standing or walking about for a half hour would be sufficient before returning to a sitting posture.  *Id.* at 366–67.  Dr. Balzora further opined that Plaintiff could sit for a maximum of one hour per eight-hour workday, not including time spent standing or walking about.  *Id.* at 367.

More specifically, Dr. Balzora opined that Plaintiff could stand or walk about for a maximum of half an hour at a time before switching to a sitting posture for a half hour and could stand or walk for a maximum of one hour in an eight-hour workday.  *Id.* at 367–68.  He further opined that a morning break, lunch period, and afternoon break scheduled approximately two hours apart would be sufficient for Plaintiff to rest and relieve fatigue during an eight-hour workday.  *Id.* at 368.  He opined that one hour of total cumulative time resting or lying down would be sufficient.  *Id.*

As to Plaintiff's ability to carry out various physical tasks, Dr. Balzora opined that Plaintiff could occasionally lift one to five pounds; occasionally balance while standing or walking on level terrain; never stoop; occasionally flex her neck forward; frequently flex her neck backward; never rotate her neck right; and constantly rotate her neck left.  *Id.* at 369.  He

opined that she could occasionally reach, handle, and finger objects with her left hand.  *Id.* at 369–70.  He opined that Plaintiff would require a cane to aid her in walking, but not standing, and only on uneven surfaced.  *Id.* at 370.

Finally, Dr. Balzora opined that Plaintiff's impairments would cause her to be absent from work more than three times per month.  *Id.* at 371.

### E.      Dr. Lynch's March 5, 2018 Opinion

Plaintiff's primary care physician, Dr. Kimberly Lynch, submitted a letter on March 15, 2018 to Plaintiff's counsel, along with extensive medical records.  Dkt. No. 12-2 at 880.  Dr. Lynch reported that Plaintiff was "currently suffer[ing] from multiple medical conditions including Uncontrolled Depression, Uncontrolled Insulin Dependent Diabetes Mellitus Type 2, Asthma, and Chronic pain of the right hip which are currently progressive and worsening."  *Id.* Dr. Lynch opined that, because of these conditions, she could not clear Plaintiff to return to work "until she is better managed."  *Id.*  Dr. Lynch wrote that Plaintiff would "be seen frequently in [her] clinic" and that she would "reassess her ability to start work again in summer of 2018."  *Id.* Dr. Lynch also included medical records detailing her treatment of Plaintiff from 2011 to 2019. Dkt. No. 12-2 at 880–1010; Dkt. No. 12-3 at 1011–1268.  In her April 2, 2019 hearing before the ALJ, Plaintiff testified that Dr. Lynch was the treating physician to prescribe her use of a cane for ambulating after Plaintiff's surgery on her right knee, and that Plaintiff continues to see Dr. Lynch.  Dkt. No. 12-1 at 588.

## PROCEDURAL HISTORY

### I.      Application for Benefits

On July 23, 2014, Plaintiff applied for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI, respectively, of the Social Security Act, 42 U.S.C. § 401 et seq., for a disability allegedly beginning on June 5, 2013.

9

Dkt. No. 12 at 13, 65, 66.  The date last insured, for the purpose of DIB eligibility, was December 31, 2017.  *Id.* at 15.  On October 24, 2014, the Social Security Administration ("SSA") denied Plaintiff's application, and she responded by timely requesting a hearing before an ALJ.  *Id.* at 65–75, 93–94.  The ALJ held a video hearing on July 6, 2016.  *Id.* at 31–64. Plaintiff and her counsel appeared along with an impartial vocational expert.  *Id.*  The ALJ denied Plaintiff's claims by decision dated September 1, 2016, finding that Plaintiff was not disabled from her alleged disability onset date of June 5, 2013 through the date of the decision. *Id.* at 13–30.  Plaintiff appealed the decision to the SSA's Appeals Council, which denied the appeal.  *Id.* at 1–5.

Plaintiff then filed a complaint in the United States District Court for the Southern District of New York challenging the ALJ's decision.  Dkt. 12-1 at 609–12.  On April 10, 2018, upon a joint stipulation, the case was remanded to the Commissioner.  *Id.* at 615–16.  On October 27, 2018, the Appeals Council remanded the case to the ALJ.  *Id.* at 618–25.  The Appeals Council directed the ALJ to further evaluate whether Rodriguez required the use of a cane; to further evaluate all of Rodriguez's physical impairments in assessing her RFC, specifically her obesity, left knee pain, liver inflammation, asthma, bouts of dizziness, and diabetes; and to further evaluate whether Rodriguez's left ankle impairment was a severe impairment.  *Id.* at 622–23.  The Appeals Council further noted that "[a]s appropriate, the Administrative Law Judge may request the treating and non-treating sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments."  *Id.* at 623.

Pursuant to the Appeals Council's order, a video hearing was held with the ALJ [5] on April 2, 2019, at which Rodriguez appeared with counsel along with an impartial vocational expert. *Id*. at 578–606.  Rodriguez testified that she could climb the stairs to her fifth-floor apartment only with periodic stopping and resting; that she had suffered from depression since the death of her mother; and that she had had surgery on her right knee, but the surgery had not alleviated the pain.  *Id.* at 564.  Rodriguez further testified that she took medication for diabetes, depression, and asthma, as well as insulin for her diabetes; that she required eyeglasses due to diabetic neuropathy; and that she could only sit for an hour and a half at a time before she must get up and walk around.  *Id*. at 564–65.  Rodriguez said at the hearing that she has difficulty leaving her apartment because she is reluctant to walk down the stairs, and that she stays in her apartment most of the time with the lights off, watching television, by herself.  *Id*. at 565, 594.

At the hearing, a vocational expert testified that, given Plaintiff's age, education, work experience, and RFC, Plaintiff could not perform her past work of being a security guard, and that Plaintiff would not have acquired any skills from her past work that would be transferrable. *Id*. at 600.  The ALJ provided the vocational expert with the hypothetical of someone of Plaintiff's age and education level who is "limited to light work as defined by the DOT.  [Who] cannot climb ropes, ladders or scaffolds.  [Who] cannot work at heights.  [Who] cannot operate dangerous machinery due to being on insulin.  [Who] can only occasionally stoop.  [Who] can only occasionally climb ramps and stairs.  [Who] can never kneel," and who "is limited to sedentary work as defined under the DOT and 20 CFR."  *Id*. at 599–600.  When considering this hypothetical as a proxy for Plaintiff—though importantly, this hypothetical did not mention the

---

[5] As aforementioned, ALJ Walters had retired in the interim period between the initial decision and the second hearing; thus, this second hearing was held with ALJ Toland.  Dkt. No. 12-1 at 580.

need to frequently stand up and sit down, or the near-constant experience of dizziness—the vocational expert testified that such a person would be able to perform the requirements of at least three occupations: Woodworking/Dowel Inspector; Sorter; and Final Assembler.  Dkt. No. 12-1 at 600–01.[6]  In response to further hypotheticals posed by the ALJ and Plaintiff's counsel, the vocational expert testified that all three occupations could be performed with a sit/stand option and by someone who requires the use of a cane to ambulate.  *Id.*  Lastly, the vocational expert testified that these three occupations could not be performed by someone who needed more than two unexcused absences a month.  *Id.* at 603.

## II.    The ALJ Decision

In a decision dated July 31, 2019, the ALJ held that Plaintiff was disabled as of September 24, 2018—Plaintiff's fiftieth birthday—and the date on which her age category changed from "younger individual" to "an individual closely approaching advanced age."  Dkt. No. 12-1 at 569, 571 (citing 20 C.F.R. §§ 404.1563, 416.963).  The ALJ further held that, because Plaintiff was not disabled as of December 31, 2017, the date last insured, Plaintiff was

---

[6] Dictionary of Occupational Titles ("DOT"), Nos. 669.687-014, 521.687-086, 713.687-018. The definitions from the DOT are as follows:

DOWEL INSPECTOR (woodworking): Inspects dowel pins for flaws, such as square ends, knots, or splits, and discards defective dowels.

NUT SORTER (can. & preserv.): picking-belt operator Removes defective nuts and foreign matter from bulk nut meats: Observes nut meats on conveyor belt, and picks out broken, shriveled, or wormy nuts and foreign matter, such as leaves and rocks. Places defective nuts and foreign matter into containers. May be designated according to kind of nut meat sorted as Almond Sorter (can. & preserv.); Peanut Sorter (can. & preserv.).

FINAL ASSEMBLER (optical goods): Attaches nose pads and temple pieces to optical frames, using handtools: Positions parts in fixture to align screw holes. Inserts and tightens screws, using screwdriver.

not eligible for disability insurance benefits but was eligible for supplemental security income as of September 24, 2018.  *Id*. at 571.

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date and that, between June 14, 2013 and September 23, 2018, Plaintiff "had the following severe impairments: status-post knee injury with torn meniscus, status-post arthroscopic surgery of the right knee, insulin dependent diabetes mellitus (IDDM), depression, obesity,[7] uncontrolled type II diabetes mellitus, bursitis of the hip, and asthma."  *Id*. at 562.  The ALJ also concluded that Plaintiff's liver inflammation, hypertension, and cellulitis constituted non-severe impairments.  *Id*. at 562.  The ALJ did not mention Plaintiff's dizziness or experience with vertigo.  Next, the ALJ concluded that Plaintiff's combination of impairments was not sufficiently severe to meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, and that accordingly Plaintiff was not per se disabled.  *Id*.  In reaching this conclusion, the ALJ granted "partial weight" to both Dr. Mescon's and Dr. Balzora's opinions of Plaintiff's physical impairments, and "great weight" to Dr. Broska's opinion of her mental impairments.  *Id*. at 568.  The ALJ accorded "little weight" to the opinions of Dr. Lynch and Dr. Inman-Dundon regarding Plaintiff's physical or mental impairments.  *Id*. at 568–69.

Next, the ALJ determined that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a)[8] with the following qualifications: Plaintiff

---

[7] The ALJ found that Plaintiff's obesity constituted a severe impairment because "it is certainly conceivable that the claimant's obesity could exacerbate the claimant's knee pain, and the symptoms associated with the claimant's hip bursitis," as well as "the pain associated with the claimant's other physical impairments."  Dkt. No. 12-1 at 568.

[8] The regulation reads "20 C.F.R. § 404.1567(a): *Sedentary work.*  Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting,

could sit for up to six hours per day but for no more than one hour at a time; Plaintiff would need

to stand or shift positions for up to five minutes per hour while remaining on task; Plaintiff could

not climb ropes, ladders, or scaffolds; Plaintiff could not work at heights; Plaintiff could not

operate dangerous machinery due to her insulin dependency; Plaintiff could occasionally climb

ramps and stairs; Plaintiff could only occasionally stoop; Plaintiff could never kneel; Plaintiff

would need to ambulate with a cane; Plaintiff would need to be limited to low stress work,

meaning no fast production rate, and no strict production quotas; and Plaintiff would need to

avoid exposure to dust, fumes, pulmonary irritants, and temperature extremes. *Id.* at 563–64.

In reaching this conclusion, the ALJ evaluated Plaintiff's statements about the intensity,

persistence, and limiting effects of her impairments and found them inconsistent with the

medical evidence on record. *Id.* at 565. The ALJ found that, although "the claimant's medically

determinable impairments could reasonably be expected to cause the alleged symptoms," "the

claimant's statements concerning the intensity, persistence and limiting effects of these

symptoms are not fully supported" by the evidence on record. *Id.* at 568.

In reaching her conclusion as to Plaintiff's RFC, the ALJ also relied on the opinion

evidence. The ALJ accorded "partial weight" to Dr. Mescon's opinion "as it pertains to the

moderate to severe limitations as to" Plaintiff's ability to sit, stand, climb, push, pull, and/or

carry heavy objects. *Id.* at 568. The ALJ also found, however, that due to Plaintiff's hip and

---

a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are
sedentary if walking and standing are required occasionally and other sedentary criteria are met.
20 C.F.R. § 416.967(a): *Sedentary work.* Sedentary work involves lifting no more than 10
pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools. Although a sedentary job is defined as one which involves sitting, a certain amount of
walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking
and standing are required occasionally and other sedentary criteria are met."

back impairments, she "would benefit from a limitation that allows the claimant to stand up and move after an hour of sitting." *Id.*

The ALJ accorded partial weight to Dr. Balzora's opinion as well, "disagree[ing] with the comprehensive nature" of the "drastic" limitations Dr. Balzora issued, but "concur[ring] as far as the claimant requires a cane to ambulate, as her knee and hip impairments would make ambulation without an assistive device difficult." *Id.*

The ALJ accorded "little weight" to Dr. Inman-Dundon's "cursory finding" that Plaintiff's depression was not a severe impairment "based on the lack of psychiatric treatment and the claimant's ability to discharge activities of daily life" because it was "inconsistent with later assessments by Drs. Broska and Vando, both of whom assessed the claimant with depression stemming from her mother's passing."[9] *Id.*

The ALJ accorded "great weight" to Dr. Broska's psychiatric evaluation because the opinion was "consistent with the claimant's performance during Dr. Broska's mental status exam" and "consistent with the claimant's own allegations that she has a propensity for isolation and social withdrawal." *Id.* at 569.

Finally, the ALJ accorded "little weight" to Dr. Lynch's opinion that Plaintiff is "totally disabled" because her "wording seemingly posits that the claimant's impairments are temporary, meaning that the impairments may not last up to twelve months." *Id.*  Because Dr. Lynch apparently opined that Plaintiff's impairments "may not last at least twelve months, . . . her opinion as to totally [sic] disability is unsound." *Id.*

---

[9] The ALJ apparently accorded no weight to Dr. Vando's opinion, given that the ALJ did not mention this opinion in her review of the opinion evidence.

The ALJ concluded that Rodriguez was not capable of performing her past relevant work as actually or generally performed because it "exceeds the claimant's current [RFC]." *Id.* at 569. Because of this, the ALJ went on to find, based on the vocational expert's testimony at the hearing, that Rodriguez would have been able to adjust to and perform the requirements of several occupations, such as: woodworking/dowel inspector, sorter, and final assembler. *Id.* at 570–71. As of September 24, 2018, the date on which Rodriguez's age category changed, the ALJ found "there are no jobs that exist in significant numbers in the national economy that claimant could perform." *Id.* at 571 (citation omitted). Accordingly, as of that date, the ALJ found that Plaintiff is disabled. *Id.* Because Rodriguez was not disabled prior to December 31, 2017, her last date insured, the ALJ held that she was not eligible for disability insurance benefits. *Id.* The ALJ did hold that Rodriguez was eligible for supplemental security income beginning on September 24, 2018. *Id.*

## III.   Appeals Council

Plaintiff appealed the ALJ's July 31, 2019 decision, which denied Plaintiff's disability claims prior to September 24, 2018, to the Appeals Council. *Id.* at 549. The Appeals Council denied the appeal on May 12, 2020. *Id.* Plaintiff received the Appeals Council's letter affirming the ALJ's decision on May 19, 2020, thereby making the ALJ's July 31, 2019 decision the Commissioner's final decision reviewable by this Court. *See* 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981, 416.1581.

## IV.   Procedural History in This Court

On July 10, 2020, Plaintiff filed a complaint with this Court, appealing the portion of the ALJ's July 31, 2019 decision finding her not disabled prior to September 24, 2018.[10] Dkt. No. 5.

---

[10] The complaint was initially filed on July 9, 2020, but there was a filing error. *See* Dkt. No. 1. The complaint was then corrected and refiled on July 10, 2020.

On February 4, 2021 Plaintiff filed a motion for judgment on the pleadings, pursuant to Federal Rule of Civil Procedure 12(c), Dkt. No. 13, and a memorandum of law in support of her motion, Dkt. No. 14.  On April 5, 2021 Defendant filed a cross-motion for judgment on the pleadings, Dkt. No. 15, and a memorandum of law in support, Dkt. No. 16.  On April 29, 2021, Plaintiff filed a reply.  Dkt. No. 17.

## LEGAL STANDARD

A judgment on the pleadings under Rule 12(c) is appropriate where "the movant establishes that no material issue of fact remains to be resolved" such that a judgment on the merits can be made "merely by considering the contents of the pleadings."  *Guzman v. Astrue*, 2011 WL 666194, at *6 (S.D.N.Y. Feb. 4, 2011) (first citing *Juster Assocs. v. City of Rutland*, 901 F.2d 366, 369 (2d Cir. 1990); and then citing *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988)).  In reviewing a final decision of the Commissioner, the Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g) (made applicable through 42 U.S.C. § 1383(c)(3)).  That is, the Court has discretion to determine whether or not a remand is appropriate in evaluating the ALJ's decision.  *Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004) (quoting 42 U.S.C. § 405(g)); *see Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).  The Court may set aside the ALJ's decision where it is based on legal error or is not supported by substantial evidence in the record.  Substantial evidence is "more than a mere scintilla"—it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citations omitted); *see Burgess v. Astrue*, 537 F.3d 117, 127–28 (2d Cir. 2008) (citing *Perales*, 402 U.S. at 401); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (same).  Though this standard is deferential to an ALJ's finding, an

ALJ's disability determination must be reversed if it is not supported by substantial evidence or remanded if it contains legal error. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (Sotomayor, J.); *Diaz v. Shalala*, 59 F.3d 307, 312 (2d Cir. 1995).

Where there are gaps in the administrative record or the ALJ has misapplied legal standards, "remand to the commissioner for further development is in order." *Rosa*, 168 F.3d at 82–83 (quoting *Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir. 1996)). Thus, a reversal of the ALJ's disability date determination—and a date finding in its stead by this Court—is appropriate under sentence four of 42 U.S.C. § 405(g) only where "the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).

## DISCUSSION

Plaintiff argues that the Court should grant Plaintiff's motion for judgment on the pleadings and either reverse the ALJ's decision or remand the case for further proceedings. Dkt. No. 14 at 4. Specifically, Plaintiff argues that, based on Plaintiff's severe impairments, the ALJ should not have found that Plaintiff was capable of performing the requirements of any full-time occupation during the period in question and that Plaintiff was disabled from the alleged onset date. *Id.* at 18–19. First, Plaintiff argues that the ALJ's finding that Plaintiff would require a sit/stand option for sedentary work should have directed the ALJ to find that Plaintiff was disabled. *Id.* at 19. Second, Plaintiff argues that the ALJ did not give proper weight to the opinions of Plaintiff's treating physicians, Dr. Balzora and Dr. Lynch. *Id.* at 22. Third, Plaintiff argues that the ALJ failed to properly consider Plaintiff's mental impairment. *Id.* at 26. Fourth, Plaintiff argues that the ALJ erred by not finding Plaintiff disabled based on the testimony of the vocational expert at the hearing. *Id.* at 29.

I.       **The ALJ Properly Considered the Sit/Stand Option**

Plaintiff argues that the ALJ should have found Plaintiff disabled based on the need for a

sit/stand option for sedentary work, even without consulting a vocational expert. *Id*. at 20.

Plaintiff draws the Court's attention to a specific provision in Social Security Ruling ("SSR")

83–12: "Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit

or stand at will." SSR 82–12. The Ruling goes on to say, however, that "[i]n cases of unusual

limitation of ability to sit or stand, a [vocational expert] should be consulted to clarify the

implications for the occupational base." *Id*. In light of this second sentence, it was therefore

appropriate for the ALJ to consult a vocational expert in determining what the effect would be of

Plaintiff's requiring a sit/stand option on the occupations available to her, and in determining

whether Plaintiff was disabled.

In the alternative, Plaintiff argues that the ALJ's questioning of the vocational expert was

insufficient. Dkt. No. 14 at 20. Specifically, "[t]he ALJ did not define or specify any aspects of

a sit/stand option when questioning the [vocational expert]," such as how long Plaintiff would

have to sit or stand or at a time; "under what circumstances a sit/stand option would be

acceptable" for the jobs the expert identified; and whether the expert considered the sit/stand

option and use of a cane as separate hypotheticals, or as part of the same hypothetical. *Id*. at 20.

Defendant argues in response that because "[t]he [vocational expert] testified that the

three jobs that she identified could be performed with an unqualified sit-stand option," the

hypothetical considered by the vocational expert "was at least as restrictive as the ALJ's RFC

determination." Dkt. No. 16 at 32. Therefore, "any failure to seek clarification from the

[vocational expert] was harmless." *Id*. Defendant further argues that a "plain reading" of the

expert's testimony demonstrates "that the three sedentary jobs in question could be performed by

someone who required a sit-stand option and/or the use of a cane for ambulation." *Id*. at 33.

During the hearing, the ALJ questioned the vocational expert about a hypothetical person

with Plaintiff's impairments who needed to use a cane:

> Q: . . . [I]f the individual was – would need to ambulate with a cane, would that rule
> out any of the sedentary jobs?
>
> A: It would not.  The – no work tasks are required while ambulation – ambulating.
>
> Q: And if I further added that this individual would need to – would need a cane to
> stand and balance, would that rule out these jobs?
>
> A: Only if the person had to stand while performing the job, which is not required
> in sedentary jobs, and the cane and the person had to use one hand to balance.  So,
> it would have to be for a reason other than required by the jobs that the person
> would have to stand.

Dkt. No. 12-1 at 601.

Plaintiff's counsel questioned the expert separately about the need for a sit/stand option:

> Q: . . . Now, can these jobs be done with a sit/stand option?
>
> A: Yes, they can.
>
> Q: If the person is unable to sit more than half of the day and has to exercise the
> option to stand, would the use of a cane to stand eliminate these jobs?
>
> A: It would because it would cut the pace down to a pace that could not sustain the
> completion of the work.

*Id*. at 602.

In determining whether a significant number of jobs exist in the national economy that a

claimant is capable of performing, an ALJ may rely on a vocational expert's testimony regarding

a hypothetical as long as the testimony is supported by substantial evidence on the record.

*McIntyre v. Colvin*, 758 F.3d 146, 151–52 (2d Cir. 2014); *Calabrese v. Astrue*, 358 F. App'x

274, 276 (2d Cir. 2009); *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983).  The

hypothetical in question must "accurately reflect the limitations and capabilities of the claimant

involved."  *McIntyre*, 758 F.3d at 151 (citing *Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir.

1981)).  *See also Rivera v. Colvin*, 2014 WL 3732317, at *40 (S.D.N.Y. July 28, 2014)

("Provided that the characteristics described in the hypothetical question accurately reflect the limitations and capabilities of the claimant and are based on substantial evidence in the record, the ALJ may then rely on the vocational expert's testimony regarding jobs that could be performed by a person with those characteristics.").  There is no requirement that a vocational expert "identify with specificity the figures or sources supporting his conclusion, at least where he identified the sources generally." *Bonilla-Bukhari v. Berryhill*, 357 F. Supp. 3d 341, 354–55 (S.D.N.Y. 2019) (quoting *McIntyre*, 758 F.3d at 152).  "The Commissioner need only show one job existing in the national economy that [the claimant] can perform." *Bavaro v. Astrue*, 413 F. App'x 382, 384 (2d Cir. 2011) (internal citation omitted).

The threshold question is whether the hypotheticals posed to the vocational expert accurately reflected Plaintiff's capabilities and limitations.  This Court concludes that they did.  The evidence in the record demonstrates that Plaintiff requires the use of a cane to ambulate.  Dkt. No. 12-1 at 449–53, 517–21, 917–46.  The evidence in the record, including the ALJ's observation that Plaintiff was "getting up and down a lot" during the hearing, *see id*. at 594, also establishes that Plaintiff has difficulty sitting for long periods of time without standing and walking breaks, *see* Dkt. No. 12 at 365.[11]

Given that the record does not indicate that Plaintiff requires the use of a cane to stand and balance, this Court finds that even if the ALJ committed an error by not sufficiently

---

[11] On the other hand, the evidence in the record does not support the hypothetical Plaintiff's counsel posed to the vocational expert of an individual who cannot sit more than half of the day and who needs to use a cane to stand.  There is not sufficient evidence on the record to indicate that Plaintiff requires the use of a cane to stand, as opposed as to requiring the use of a cane to walk, which is well supported.  Although this more restricted hypothetical would preclude Plaintiff from performing the functions of the occupations put forward by the vocational expert, it does not accurately reflect Plaintiff's capabilities and limitations.  This hypothetical was not addressed by the ALJ in her opinion, and Plaintiff has not raised it in her appeal, so this Court need not consider it any further.

questioning the vocational expert, the error is harmless.  The vocational expert testified, without

qualifying her testimony, that the occupations identified could be performed with a sit/stand

option and that the use of a cane to ambulate would not rule out Plaintiff's ability to perform

those occupations.  Dkt. No. 12-1 at 601.  The vocational expert further qualified that the

occupations she identified could be performed in a standing position.  *Id*.  Although she testified

that they could not be performed by someone who can only sit for half of the day and required

the use of a cane to stand, that hypothetical does not accurately reflect the Plaintiff's capabilities

and limitations.  Whether the expert considered the sit/stand option and the use of a cane to

ambulate (not stand) as one continuous hypothetical, or as two separate hypotheticals, is

immaterial, as there is no reason to assume one continuous hypothetical would have affected the

expert's determination.

## II.     The ALJ Erred in Weighing the Opinions of Plaintiff's Treating Physicians

Next, Plaintiff argues that the ALJ did not give proper weight to the opinions of

Plaintiff's treating physicians, Dr. Lynch and Dr. Balzora.

The Second Circuit has stated that:

> The SSA recognizes a rule of deference to the medical views of a physician who is
> engaged in the primary treatment of a claimant.  Thus, "the opinion of a claimant's
> treating physician as to the nature and severity of the impairment is given
> 'controlling weight' so long as it 'is well-supported by medically acceptable clinical
> and laboratory diagnostic techniques and is not inconsistent with the other
> substantial evidence in [the] case record."

*Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (alteration in original) (first quoting *Burgess*,

537 F.3d at 128; and then quoting 20 C.F.R. § 404.1527(c)(2)).

There are circumstances when it is appropriate for an ALJ "not to give controlling weight

to a treating physician's opinion."  *Id.* (citing *Halloran*, 362 F.3d at 32).  For example, "the

opinion of the treating physician is not afforded controlling weight where . . . the treating

physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Halloran*, 362 F.3d at 32.

When a treating physician's opinion is not given controlling weight, "SSA regulations require the ALJ to consider several factors in determining how much weight the opinion should receive." *Greek*, 802 F.3d at 375 (citing 20 C.F.R. § 404.1527(c)(2)(i), (2)(ii), (3)–(6)).  To override the treating physician's opinion, the ALJ must consider "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist." *Id.* (quoting *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam)).  After considering these four factors, the ALJ must "comprehensively set forth his reasons for the weight assigned to a treating physician's opinion." *Burgess*, 537 F.3d at 129 (quoting *Halloran*, 362 F.3d at 33); *see also Greek*, 802 F.3d at 375 (reaffirming these holdings).  Indeed, "failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Id.* (citing *Burgess*, 537 F.3d at 129–30; *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)).  The Second Circuit has also held that:

> An ALJ's failure to "explicitly" apply the *Burgess* factors when assigning weight at step two is a procedural error.  If "the Commissioner has not [otherwise] provided 'good reasons' [for its weight assignment]," we are unable to conclude that the error was harmless and consequently remand for the ALJ to "comprehensively set forth [its] reasons."  If, however, "a searching review of the record" assures us "that the substance of the treating physician rule was not traversed," we will affirm.

*Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019) (first citing *Selian*, 708 F.3d at 419–20; and then citing *Halloran*, 362 F.3d at 32–33).[12]

---

[12] As of January 18, 2017, the SSA issued new regulations revising its rules about acceptable medical sources and consideration of medical opinions and advice.  *See* 82 Fed. Reg. 5,844, 2017 WL 168819 (Jan. 18, 2017).  These new regulations for evaluating evidence diminish the treating physician rule, but only apply to claims filed on or after March 27, 2017; thus, they are not relevant to the instant matter.

The ALJ need not recite each *Burgess* factor explicitly if the decision reflects application of the substance of the treating physician rule.  *See, e.g.*, *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) ("When an ALJ refuses to give controlling weight to the medical opinion of a treating physician, he/she must consider various 'factors' in deciding how much weight to give the opinion.  . . .  The Commissioner must also give 'good reasons' for the weight given to the treating source's opinion.  Nevertheless, where 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." (first citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); then citing *Halloran*, 362 F.3d at 32; and then citing *Schaal v. Apfel*, 134 F.3d 496, 503–04 (2d Cir. 1998))); *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Berry v. Schweiker*, 675 F.2d, 464, 469 (2d Cir. 1982); *Galente v. Acting Comm'r of Soc. Sec.*, 2018 WL 852113, at *16 (S.D.N.Y. Feb. 12, 2018) (holding that a treating physician's testimony could be given less weight without reciting each *Burgess* factor when their testimony is internally inconsistent, conflicts with other medical evidence in the record, or when the ALJ "applied the substance of the treating physician rule and provided good reasons for affording less weight to [the treating physician's] opinion").

Here, the ALJ did not explicitly consider the *Burgess* factors in according Dr. Lynch's opinions "little weight."  Dkt. No. 12-1 at 569.  The ALJ wrote:

> The undersigned accords little weight to the opinion of Dr. Kimberly Lynch, who opined that the claimant is totally disabled, until at such a point as to when these impairments are better managed.  Dr. Lynch's wording seemingly posits that the claimant's impairments are temporary, meaning that the impairments may not last up to twelve months.  If Dr. Lynch is opining that the claimant's impairments may not last at least twelve months, then her opinion as to totally [sic] disability is unsound.

*Id*.

Nor did the ALJ address the substance of any of the four *Burgess* factors in according Dr. Lynch's opinion "little weight." As to the first *Burgess* factor, the ALJ did not address the frequency, length, nature, and extent of Dr. Lynch's treatment of Plaintiff, nor did she acknowledge that Dr. Lynch was Plaintiff's treating physician. Medical records submitted by Dr. Lynch suggest that Dr. Lynch treated Plaintiff from 2011 through 2019, *see* Dkt. No. 12-2 at 880–1010; Dkt. No. 12-3 at 1011–1268, and as Plaintiff testified before ALJ Tolland, Dr. Lynch continued to treat Plaintiff as of April 2, 2019, *see* Dkt. No. 12-1 at 588. As to the second *Burgess* factor, the ALJ did not address the amount of medical evidence supporting Dr. Lynch's opinion about whether Plaintiff was disabled. Instead, the ALJ solely focused on the possibility that Plaintiff may not be disabled in the future *if* her impairments become better managed; abstracting from this possibility, the ALJ concluded that Dr. Lynch was suggesting Plaintiff's impairments are temporary and may last less than 12 months, in which case she could not qualify as disabled. *See* Dkt. No. 12-1 at 569. The ALJ's presumptions about Dr. Lynch are unsound. While the claimant holds the general burden of proving that they have a disability within the meaning of the SSA, *see, e.g.*, *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002), and "bears the burden of proving his or her case at steps one through four" of the sequential five-step framework established in the SSA regulations, *Butts,* 388 F.3d at 383, the ALJ has an affirmative obligation to develop the administrative record. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1990) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record."). As the Second Circuit holds in *Burgess*:

> In light of the ALJ's affirmative duty to develop the administrative record, "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." *Rosa v. Callahan,* 168 F.3d 72, 79 (2d Cir. 1999). Further, "the ALJ must not only develop the proof but carefully weigh it."

> *Donato v. Secretary of Department of Health & Human Services,* 721 F.2d 414,
> 419 (2d Cir.1983).

537 F.3d at 126.  Thus, if the ALJ was skeptical as to whether Dr. Lynch was implying that
Plaintiff's impairments were temporary, or were going to be resolved within 12 months, and if
the ALJ's willingness to substantially weigh Dr. Lynch's medical opinion depended on such an
implication, then the ALJ could have (and should have) fulfilled her affirmative duty to develop
the administrative record by asking Dr. Lynch for clarification.[13]

 As for the third *Burgess* factor, the ALJ did not attempt to reconcile whether Dr. Lynch's
opinion was consistent with the remaining medical evidence.  This omission is especially glaring
because Dr. Lynch provided nearly 400 pages of medical records from her treatment of Plaintiff
during the period at issue in this case.  *See* Dkt. No. 12-2 at 880–1010; Dkt. No. 12-3 at 1011–
1268.  Finally, as to the fourth factor, the ALJ made no mention of whether or not Dr. Lynch was
a specialist.  Accordingly, the ALJ did not properly consider the three *Burgess* factors in
determining the proper weight to accord Dr. Lynch's opinion.

 In addition, in deciding to accord Dr. Balzora's opinion partial weight, the ALJ also did
not explicitly or implicitly consider the *Burgess* factors.  The ALJ wrote:

> [T]he undersigned accords partial weight to the opinions of Dr. [Balzora].  To
> recall, Dr. [Balzora] issued the claimant a series of limitations, which included a
> maximum allowance of one hour per day sitting, a half hour per day standing, an
> allowance for a left leg elevation, and a limit of lifting only five pounds.
> Additionally, Dr. [Balzora] opined that the claimant could only sit for a maximum
> duration of one hour per day, while talking [sic] a half hour break.  The undersigned
> not only finds that such a limitation is drastic considering the nature of the
> claimant's impairments but notes that Dr. [Balzora] issued no opinion about
> whether the claimant could remain on task while standing.  The undersigned
> disagrees with the comprehensive nature of these limitations.  The undersigned
> finds no evidence on record to support such a restrictive limitation represented as a
> maximum one hour of daily sitting, a half hour of sitting, and a five pound lift and

---

[13] As Plaintiff notes, "Even if the ALJ was unclear as to whether Dr. Lynch intended to mean
that plaintiff's condition would continue for another 12 months into the future, it was clear that it
had already lasted well over 12 months since Dr. Balzora's opinion in 2015."  Dkt. No. 14 at 24.

> carry weight limit.  Dr. [Balzora] further opined that the claimant requires a cane
> to aid in walking, but only on uneven surfaces.  The undersigned concurs as far as
> the claimant requires a cane to ambulate, as her knee and hip impairments would
> make ambulation without an assistive device difficult.

Dkt. No. 12-1 at 568.

Plaintiff identifies Dr. Balzora as her treating physician.  Dkt. No. 14 at 23.  In addition,

Dr. Balzora is listed as Plaintiff's primary care physician in her medical records as of November

2014.  Dkt. No. 12 at 358.

The ALJ did not address the first *Burgess* factor, the frequency, length, nature, and extent

of Dr. Balzora's treatment of Plaintiff, or acknowledge that Dr. Balzora was Plaintiff's treating

physician.  As to the second *Burgess* factor, the ALJ did address the medical evidence supporting

Dr. Balzora's opinion about whether Plaintiff was disabled, finding "no evidence on record to

support" limitations to the extent recommended by Dr. Balzora.  Dkt. No. 12-1 at 568.[14]  In

dismissing Dr. Balzora's opinions as "drastic," the ALJ points out that "Dr. [Balzora] issued no

opinion about whether the claimant could remain on task while standing"; however, this point

seems to be a red herring, seeing as none of the sedentary occupations recommended by the

vocational expert require remaining on task while standing, or standing at all.  *Id*.  As to the third

*Burgess* factor, the ALJ attempted to reconcile whether Dr. Balzora's opinion about Plaintiff's

conditions and restrictions were consistent with the remaining medical evidence, but said they

were not, with the exception of Plaintiff's need to use a cane for ambulating.  *Id.*  As to the

fourth and final factor, the ALJ made no mention of whether or not Dr. Balzora was a specialist.

---

[14] Plaintiff argues that Dr. Balzora's opinions and recommended limitations are supported by Dr. Lynch's opinion.  *See* Dkt. No. 14 at 23–24 (noting that the opinions of Dr. Balzora and Dr. Lynch "which were more than three years apart, corroborated each other and were supported by the medical records").  However, the ALJ dismissed Dr. Lynch's opinion in its entirety and did not engage with this argument.

The Second Circuit has held that, in the absence of "good reasons" for not according proper weight to the opinion of a claimant's treating physician, remand is proper. *Greek*, 802 F.3d at 375 (first citing *Burgess*, 537 F.3d at 129–30; and then citing *Snell*, 177 F.3d at 133). Given the ALJ's failure to apply the *Burgess* factors in according little or partial weight to the opinions of Plaintiff's treating physicians Dr. Lynch and Dr. Balzora, and given that the ALJ was instructed by the Appeals Council when this case was remanded that she "may request the treating and non-treating sources to provide additional evidence and/or further clarification of the opinions and medical source statements about what the claimant can still do despite the impairments," Dkt. No. 12-1 at 623, the Court concludes that the reasons the ALJ provided were insufficient as a matter of law. This case should be remanded to develop the record further and to give proper weight to the opinions of Dr. Lynch and Dr. Balzora or establish more comprehensive reasons for giving little to no weight to these two treating physicians' opinions in accordance with the three *Burgess* factors.

### III.     The ALJ Properly Considered Plaintiff's Mental Impairment

Plaintiff argues that the ALJ failed to properly consider Plaintiff's mental impairment and its impact on her disability status. Dkt. No. 14 at 26. Defendant argues that the ALJ sufficiently considered Plaintiff's mental impairment, leading the ALJ to conclude that "Plaintiff would benefit from being limited to low stress work due to her depression." Dkt. No. 16 at 21. In evaluating Plaintiff's depression, the ALJ is required, as Plaintiff explains, to analyze section B of 20 C.F.R. Part 404, Subpt. P., App. 1 § 12.04 ("Listing 12.04"). This section reads as follows:

> **12.04 Depressive, bipolar and related disorders (see 12.00B3), satisfied by A and B, or A and C:**
>
> A. Medical documentation of the requirements of paragraph 1 or 2:
>
> 1. Depressive disorder, characterized by <u>five</u> or more of the following:

a. Depressed Mood

b. Diminished interest in almost all activities;

c. Appetite disturbance with change in weight;

d. Sleep disturbance;

e. Observable psychomotor agitation or retardation;

f. Decreased energy;

g. Feelings of guilt or worthlessness;

h. Difficulty concentrating or thinking; or

i. Thoughts of death or suicide

AND

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

1. Understand, remember, or apply information (see 12.00E1)

2. Interact with others (see 12.00E2).

3. Concentrate, persist, or maintain pace (see 12.00E3).

4. Adapt or manage oneself (see 12.00E4).

Dkt. No. 14 at 27. Plaintiff argues that in evaluating section B of Listing 12.04, the ALJ picked and chose which evidence to consider and which to ignore within Dr. Broska's September 29, 2014 psychiatric examination and that such cherry-picking is discouraged. *See, e.g.*, *Starzynski v. Covin*, 2016 WL 6956404, at *3 (W.D.N.Y. Nov. 29, 2016) (holding that "[i]t is plainly improper for an ALJ to cherry-pick evidence that supports a finding of not-disabled while ignoring other evidence favorable to the disability of claimant.").

However, the Court does not find that the ALJ engaged in cherry-picking given the comprehensive review of Dr. Broska's psychiatric evaluation set forth below. And even accepting, *arguendo*, that the ALJ had engaged in cherry-picking, the Court does not find that a

more comprehensive analysis of Dr. Broska's psychiatric evaluation (or any of Plaintiff's psychiatric evaluations on the record) would support a finding of disability based on Plaintiff's mental impairments.  In her decision, the ALJ extensively evaluated Plaintiff's "psychiatric examiners ultimate diagnoses and medical source statements," as well as "the claimant's alleged symptomology[] [and] the mental status exams."  Dkt. No. 12-1 at 567.  First, the ALJ considered Plaintiff's July 10, 2013 assessment by Dr. Vando in which Plaintiff alleged "depressive symptomology, such as difficulty sleeping, anxiety, crying often, loss of motivation, low energy, and hopelessness in response to her mother's death," and was diagnosed with "major depressive disorder, single episode of a moderate degree." *Id*.  This depressive symptomology noted by both Dr. Vando and the ALJ could meet the conditions of section A of Listing 12.04 paragraph 1 (medical evidence exists documenting Plaintiff's experience of depressive mood, sleep disturbance, decreased energy, and feelings of worthlessness).  However, these limitations were, as Dr. Vando noted, "moderate," and thus this evaluation would not support a finding of extreme limitation in any of the areas of mental functioning listed in section B Listing 12.04.[15]  Next, the ALJ evaluated Dr. Broska's September 29, 2014 psychiatric evaluation of Plaintiff, in which she "assessed the claimant with an unspecified depressive disorder." *Id*.  As the ALJ explained:

> In her medical source statement, Dr. Broska opined that the claimant has no limitation in her ability to follow and understand simple instructions, or perform simple or complex tasks independently.  Additionally, Dr. Broska opined that the claimant has no limitation in maintaining attention and concentration, although there is evidence for mild limitations as to memory.  Further, Dr. Broska opined that there is no evidence of any limitation in the claimant's ability to maintain a regular schedule, although there is evidence for a mild to moderate limitation in terms of relating adequately with others, and a moderate limitation in appropriately dealing with stress.

---

[15] Notably, in critiquing of the ALJ's evaluation of Plaintiff's mental impairment, Plaintiff does not mention the ALJ's consideration of Dr. Vando's psychiatric evaluation.

*Id.* (internal citations omitted).  Plaintiff argues that the ALJ failed to note that Plaintiff "had moderate limitations in dealing with stress and mild to moderate limitations relating adequately with others," Dkt. No. 14 at 27; however, in the excerpt above the ALJ did exactly that.

Lastly, Plaintiff argues that the ALJ's paragraph B criteria assessment of Listing 12.04 is insufficient because "it does not provide specific examples reflecting the record and combines all areas of functioning."  *Id.*  The operative regulation, 20 C.F.R. § 404.150a, notes that when rating the degree of functional limitation, "[a]ssessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation," and specifies that "[a]t the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)."  *Id.* at 27–28.  While it is true, as Plaintiff notes, that the ALJ did not document every piece of evidence concerning Plaintiff's mental impairments in her opinion, the Court finds these omissions harmless because the extensive evidence the ALJ did include summarizes nearly all of the mental impairment evidence on the record (nor would it be reasonable to include every piece of evidence from a multi-year record).  The two potentially major omissions made by the ALJ include her failure to mention that on three occasions—March 23, 2017, June 15, 2017, and November 17, 2017—Plaintiff received a PHQ-9 score above 14 (but below 18), which would indicate moderately severe depression, *see id.* at 28–29, and her failure to note that Plaintiff experienced suicidal ideation for a period of days following Thanksgiving in November 2017, *see* Dkt. No. 12-2 at 992.  Serious as these records and

experiences of moderately severe depression and temporary suicidal ideation in 2017 are, as the

ALJ explains in her opinion, neither was sufficiently persistent to satisfy the paragraph "C"

criteria of Listing 12.04:

> The claimant's mental impairment(s) does not satisfy the paragraph "C" criteria of the applicable mental disorder listing(s). In order for the claimant to meet the requirements of paragraph C, the claimant must show that a mental disorder is serious and persistent, which is represented in a documented psychiatric treatment history at least two years in duration. Further, this treatment history must include findings that the claimant is undergoing mental health therapy, which diminishes the signs and symptoms of that mental health disorder. Furthermore, the claimant must demonstrate that they retain only a minimal capacity to adapt to changes in environment, or demands that are not part of the claimant's everyday life. Applied herein, the record does not reflect any sort of psychiatric hospitalization. The claimant herself denied any history of psychiatric hospitalization.

Dkt. No. 12-1 at 563.  The Court does not find evidence in the record to contradict the ALJ's

conclusion that Plaintiff experienced a beyond-moderate depressive diagnosis for at least two

years, or that Plaintiff is continuously undergoing mental health therapy, or that Plaintiff retains

only minimal capacity to adapt to changes in her environment.  Thus, the Court concludes that

any omissions in the ALJ's assessment of Plaintiff's mental impairments are immaterial.

## IV.   The ALJ Improperly Considered the Vocational Expert's Testimony

Plaintiff argues that the ALJ erred by not finding Plaintiff disabled based on the

testimony of the vocational expert at the 2019 ALJ hearing.  For the Plaintiff to be held not-

disabled, under steps four and five of the five-step sequential evaluation process used to

determine whether the claimant's condition meets the SSA's definition of disability, Plaintiff

must not be capable of performing her past type of work (step four), and there must not be

another type of work Plaintiff could do in the national economy (step five).  *See* C.F.R. §

404.1520; *see also Green–Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir.2003).  As the ALJ

explained in her opinion, the vocational expert clearly stated that Plaintiff cannot perform her

past type of work; thus, Plaintiff fails step four of the five-step sequential evaluation process.

*See* Dkt. No. 12-1 at 569 ("At the hearing, a vocational expert testified that the functional capacity required for the claimant's past relevant work exceeds the claimant's current [RFC]. Accordingly, the claimant is unable to perform past relevant work as actually or generally performed.")  Next, when considering whether the Plaintiff can perform the three occupations that the vocational expert testified she could perform given her age, education, work experience, and RFC (Woodworking/Dowel Inspector, Sorter, or Final Assembler), the ALJ failed to consider the vocational expert's testimony concerning acceptable unexcused absences in these occupations.  As Plaintiff notes, when examined by Plaintiff's attorney at the 2019 ALJ hearing, the vocational expert testified that for the three occupations Plaintiff could perform, "the tolerance would be no more than five unexcused absences a year."  *Id*. at 603.  This requirement directly conflicts with Plaintiff's treating physician Dr. Balzora's December 11, 2015 estimation that on average, Plaintiff is likely to be absent from work as a result of her impairments or treatment "more than 3 times a month."  Dkt. No. 12 at 371.  In her evaluation of the vocational expert's testimony, the ALJ never mentions Dr. Balzora's estimation that Plaintiff will have substantially more than five unexcused absences a month.  The ALJ may have not mentioned Dr. Balzora's estimation on this matter because, as she explains in her opinion, she accords only "partial weight" to Dr. Balzora's opinions.  Dkt. No 12-1 at 568.  However, as explained in Section II of the Discussion, before rejecting a treating physician's opinions, the ALJ must at least consider the four *Burgess* factors (first, the frequency, length, nature, and extent of the treatment; second, the amount of medical evidence supporting the opinion; third, the consistency of the opinion with the remaining medical evidence; and fourth, whether the physician is a specialist).  Here, given the ALJ said nothing about Dr. Balzora's opinion concerning Plaintiff's need for multiple unexcused absences a month, she cannot be said to have explicitly or implicitly

considered the four *Burgess* factors with respect to Dr. Balzora's opinion on this matter, or set forth her reasoning for rejecting this opinion.

While Dr. Balzora's evaluation was an estimation expressed via a multiple-choice format medical form, if the ALJ had any doubts about this evaluation from Plaintiff's treating physician, she had an obligation to substantiate the record.  *See Rosa v. Callahan,* 168 F.3d at 79 ("An ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.").  The ALJ's failure to consider how Plaintiff's need for more than five unexcused absences a year might impact her ability to hold the occupations proposed by the vocational expert is a substantial omission, as it could have disqualified her from these occupations and thus resulted in a determination of disabled.  On remand, the record should be further developed to consider Dr. Balzora's opinion concerning Plaintiff's potentially disqualifying need for multiple unexcused absences a month.

## CONCLUSION

For the reasons above, Plaintiff's motion is GRANTED, and Defendant's cross-motion is DENIED.  This case is hereby remanded for further proceedings consistent with this Opinion. The Clerk of Court is respectfully directed to close Dkt. Nos. 13 and 15.


SO ORDERED.

Dated: July 27, 2022
      New York, New York                          LEWIS J. LIMAN
                                              United States District Judge